

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 APR 21 PM 4: 05

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SANDRA M. KIM, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NEWPARK RESOURCES, INC., JAMES D. COLE and MATTHEW W. HARDEY, <br><br> Defendants. | No. **06-2150** <br><br> CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS **SECT. E MAG.4** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

### <u>NATURE OF ACTION</u>

1.     This is a federal class action on behalf of persons who purchased or otherwise acquired the securities of Newpark Resources, Inc. ("Newpark" or the "Company") between February 28, 2005 and April 16, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Newpark Resources, Inc. provides fluids management, environmental, and oilfield services, including drilling fluids sales, engineering services and onsite drilling fluids processing services, to the oil and gas exploration and production industry.

3.     Plaintiff alleges that defendants' Class Period representations regarding Newpark were materially false and misleading when made because the Company failed to disclose

–1–

Fee___350.___
✓ Process_____
X Dktd _____
___ CtRmDep_____
___ Doc. No_____

irregularities with the processing and payment of invoices by the Company's subsidiary, Soloco Texas, LP . As a result, defendants' Class Period statements concerning Newpark's operations and financial performance were materially false and misleading.

4.     On April 17, 2006, Newpark issued a press release announcing a Company investigation into the processing and payment of invoices at Soloco Texas, LP and that Newpark's CFO and former CEO had been placed on administrative leave pending the completion of the investigation. This news shocked the market, causing shares of Newpark to plummet that same day by $1.28 per share, to close on April 17, 2006, at $6.14 per share on highly elevated trading activity – more than 17% below the previous day's close, which was before disclosure of the invoice irregularities and consequent investigation.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder 17 C.F.R. § 240.10b-5.

6.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

7.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office in this Judicial District.

8.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

9.      Plaintiff Sandra M. Kim, as set forth in the accompanying certification, incorporated by reference herein, purchased Newpark securities at artificially inflated prices during the Class Period and has been damaged thereby.

10.     Defendant Newpark Resources, Inc. is a Delaware corporation headquartered in Metairie, Louisiana, that provides fluids management, environmental, and oilfield services, including drilling fluids sales, engineering services and onsite drilling fluids processing services, to the oil and gas exploration and production industry.

11.     Defendant James D. Cole is a Director of Newpark, and from May 1977 until December 31, 2005, served as  the Company's Chief Executive Officer (CEO). Previously, Cole served as President of Newpark from May 1977 until September 2000, and as Chairman of the Board of Directors from April 1996 until March 2005.  On March 22, 2006, Cole was named Chairman and CEO of Newpark's wholly owned subsidiary Newpark Environmental Water Solutions.

12.     Defendant Matthew W. Hardey was, at all times relevant hereto, the Company's President and Chief Financial Officer.

13.     Defendants Cole, and Hardey are sometimes referred to hereinafter as the "Individual Defendants."

14.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Newpark, were privy to confidential and proprietary information concerning Newpark, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material, adverse non-public information concerning Newpark, as discussed in detail below. Because of their positions with Newpark, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

15.    The Individual Defendants are liable as direct participants in, and as co-conspirators, with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Newpark's business.

16.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were

provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

17.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the Securities and Exchange Commission (the "SEC") pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Newpark's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Newpark's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

18.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Newpark securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (i) deceived the investing public regarding Newpark's business, operations and management and the intrinsic value of Newpark common stock and (ii) caused plaintiff and members of the Class to purchase Newpark common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Defendants' False and Misleading Statements During the Class Period

19.    The Class Period commences on February 28, 2005. On that day, Newpark issued a press release titled "Newpark Resources Reports 2004 Results; Fourth Quarter Operating Income Rebounds on 20% Revenue Growth." Therein the Company, in relevant part, stated:

METAIRIE, La., Feb. 28 /PRNewswire-FirstCall/ – Newpark Resources, Inc. (NYSE: NR) today reported net income for the year ended December 31, 2004 of $4.0 million, or $0.05 per common share including non-cash charges of $0.03 per common share, on revenue of $433.4 million. This compares to net income of $494,000 or $0.01 per common share, on revenue of $373.2 million in 2003. For the fourth quarter, Newpark reported net income of $526,000 or $0.01 per share, after the same $0.03 per share in non-cash items, on revenue of $113.7 million versus a net loss in 2003 of $2.9 million or $0.04 per share on revenue of $94.6 million. Segment operating income increased 35% for the year and 151% for the quarter, primarily driven by improvements in Newpark's Drilling Fluids and Mat Sales and Rental Business Units.

During the fourth quarter, Newpark recognized an asset impairment of $3.4 million and an $800,000 increase in its allowance for doubtful accounts due to new estimation methods adopted in the period. Excluding the impact of these non-cash items, Newpark would have reported net income of $0.08 per share and $0.04 per share for the year and the quarter respectively.

James D. Cole, Newpark's chairman and CEO said: "We believe the improved fourth quarter operating results mark the beginning of a trend that should be more evident in 2005. With approximately 50% of revenue generated from new markets, products and services, the pattern of revenue generation in 2004 evidences the progress of Newpark's diversification away from its historic Gulf Coast market. While working to implement this strategy, our efforts were complicated by a 35% decline in activity in that market. The company's earnings performance has suffered during the implementation of this initiative, during which time we have reshaped our ongoing Gulf Coast business to restore profitability at current activity levels. The introduction of new products and services has helped achieve the objective of diversifying the revenue and earnings base. We are growing our market share in our drilling fluids business and expanding into new markets in the mat sales and rental business. In addition, we have recently announced the introduction of a new, proprietary water treatment technology and its application to E&P waste streams in the Green River and Powder River basins. In short, we believe there are good opportunities for continued growth ahead for Newpark Resources."

–6–

Drilling Fluids Segment

Revenue from drilling fluids for the year totaled $272.9 million, up 27% from 2003, while contributing $21.8 million of operating income, equal to an 8.0% operating margin. This compares to $215.5 million of revenue, $12.0 million of operating income, and a 5.5% operating margin in the prior fiscal year. During the fourth quarter, drilling fluids revenue was $76.9 million compared to $56.9 million in the year-ago period. Segment operating income of $8.1 million equaled a 10.5% operating margin. This compared to $3.3 million of operating income in the 2003 period, equal to 5.7% of revenues.

Fourth quarter revenue was up 35% from the year-ago period, a combination of a 12% increase in rig activity and continued market share gains. Cole commented, "Most of the share gain came from over thirty new customer relationships developed during 2004. Newpark exited 2004 with a 20% share of rigs operated in those markets we serve, compared to 14% a year ago. In 2005, we expect to see these same trends continue, together with a 5% to 6% price increase. We expect to improve operating margins to about 12% for the full year compared to 8% in the year just ended."

Mat Sales and Mat Rentals

For the year ended December 31, 2004, revenue from mat operations was $96.0 million, generating $4.4 million in segment operating profit. This compares to $88.9 million of revenue in 2003, and $515,000 of operating profit. Fourth quarter operations showed a similar year-over-year improvement.

Cole commented: "Fourth quarter operating results improved principally as a result of cost reductions and improved oilfield rental pricing. We expect this improvement to continue in 2005 with our cost reduction program generating approximately $8 million in 2005 benefit. In addition, we expect to see a 25% gain in pricing in the oilfield rental portion of the business supported by a continuing reduction in industry capacity in that market, as well as expanded revenue and earnings from non-oilfield mat rentals and sales."

E&P Waste Services

Revenue during 2004 from E&P waste totaled $64.5 million, producing segment operating profits of $8.2 million. This compares to $68.8 million in 2003 revenue and $13.0 million in segment operating profit. The year-over- year revenue decline is a function of lower Gulf Coast waste volume due to lower rig activity and the unusual tropical weather in the third quarter. Earnings declined due to operating leverage on

the lower volume, adverse changes in the mix of active rigs, and higher transportation costs during the period.

Fourth quarter revenue totaled $16.9 million, providing $2.5 million of segment earnings. This compares to $17.8 million in revenue during the same quarter of 2003 and $3.3 million in operating contribution. Volume in the fourth quarter rebounded sequentially from 701,000 reported in the storm- impacted third quarter, to 872,000 barrels in the final quarter of 2004.

Volume for the full year, at 3.2 million barrels, declined 10% compared to 2003, principally the result of lower average rig activity during the year and adverse third quarter tropical weather. Average revenue per barrel declined 5.6% on changes in mix driven by the decline in offshore rig activity. Average pricing per barrel was $11.82 compared to $12.52 a year ago as a result of the change in mix.

"As we enter 2005, and for the first time since 2001," Cole indicated, "activity in the offshore and inland waters market has begun to improve. These have historically been the strongest markets for our waste operations, and we anticipate a 15% increase in 2005 volume if current activity levels are sustained."

Newpark recently announced the formation of Newpark Environmental Water Solutions, LLC and the first application of a newly licensed proprietary water treatment technology to improve the throughput capacity of the Company's Jonah-Pinedale oilfield waste disposal site in Wyoming, a very active North American natural gas trend. In addition, the Company has received a contract award for a treatment facility near Gillette, Wyoming for a major independent operator in the coalbed methane market. "We believe that the application of this proprietary technology to the waste water problems within the oil and gas industry could be a major new business for Newpark," said Cole.

Balance Sheet Data

Newpark ended the year with $7.0 million in cash and borrowings of $39.6 million outstanding under its bank credit facility. Working capital increased by $12.1 million during the year, principally due to the need to carry increased levels of barite inventory in support of growth in the drilling fluids business. Accounts receivable growth was negligible, with a 16 day reduction in the collection cycle helping reduce working capital needs during the year.

* * *

20.     On March 16, 2005, Newpark filed its annual report with the SEC on Form 10-K for

the fiscal year ended December 31, 2004, which reaffirmed the Company's previously announced

financial results. Additionally, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

("Sarbanes-Oxley"), the Form 10-K included certifications signed by the Individual Defendants

stating that the Form 10-Q did not include any material misrepresentations.

21.    On April 27, 2005, Newpark issued a press release titled "Newpark Resources

Reports Six Cents Per Share in First Quarter on 24% Revenue Gain." Therein the Company, in

relevant part, stated:

> METAIRIE, La., April 27, 2005 /PRNewswire-FirstCall via COMTEX/ – Newpark
> Resources, Inc. (NYSE: NR) today announced earnings of $4.9 million, or $.06 per
> diluted share, on revenue of $129.1 million for the quarter ended March 31, 2005.
> This compares to $1.4 million of net income, or $.02 per diluted share, on revenue of
> $104.3 million in the first quarter of 2004.
>
> The earnings improvement was led by the mat rental and sales business unit, the
> result of improved rental pricing in the Gulf Coast mat rental market, increased
> non-oilfield rental revenue, and increased sales of Newpark's DuraBase(TM)
> composite mats.
>
> James D. Cole, Newpark's CEO said: "In addition to improvements in operations
> during the quarter, two other events merit comment. First, we reached agreement to
> acquire the third-party interest in our DuraBase(TM) mat manufacturing facility and
> completed that transaction early in April. We now are in a position to implement
> several improvements to that product family. In addition, we announced the first
> applications of our new water treatment technology in the E&P market. We believe
> this proprietary technology will solve water quality problems in many markets,
> including coal bed methane gas production and the heavy oil operations of Canada,
> and could mature into a new stand-alone product line for the Company."
>
> Mat Rentals and Sales
>
> Mat segment revenue for the quarter increased by $11.1 million or 52% compared to
> the 2004 quarter. Rental revenue increased by $4.9 million compared to the 2004
> quarter, with $2.9 million of the increase coming from non-oilfield customers and
> $2.0 million from Gulf Coast oilfield operations. Mat sales revenue rose by $6.0
> million including 3,886 DuraBase(TM) composite mats and 5,000 wooden mats.
> Significant DuraBase(TM) sales were completed in the quarter in support of several
> E&P operations in Canada and for use in Sakhalin Island, Russia, while all of the
> wooden mats sold were for use in the Canadian market.

Gulf Coast oilfield mat rental footage installed in the quarter was 4.4 million square feet and was unchanged from the year-ago period. Average pricing was $1.12 per square foot during the first quarter, an increase of 32% compared to $0.85 a year ago. The increase in pricing accounted for $2 million of the revenue gain and a similar improvement in operating income. Revenue from non-oilfield rentals, a premium margin segment composed principally of utility and infrastructure construction markets, increased to $3.4 million in the first quarter of 2005 compared to $500,000 in the year ago period.

Mr. Cole commented, "For the last several years we have worked to reshape Gulf Coast operations to meet the current reduced rig activity. The results of those efforts are beginning to show up in operating results of the mat rental and sales business. We anticipate further improvement in Gulf Coast operations in the remainder of the company during the rest of the year. We have taken some time to right-size the inventory and operations of the mat rental business to meet the current market, and we have witnessed a consistent uptrend in pricing since early in 2004 that we believe will continue throughout the remainder of the year. The recent increase in drilling activity has enabled us to achieve higher utilization rates and better pricing in the oilfield rental market, which contributed to the improved quarter results."

Drilling Fluids

Drilling fluids revenue increased $15.5 million to $81.7 million in the first quarter, compared to $66.2 million a year earlier. Operating earnings in the drilling fluids segment rose only slightly to $6.8 million or 8.3% of revenue due to less activity in high-margin deepwater work, which has a disproportionate impact on revenue and margins, and a 28% increase in barite costs affecting all markets. The barite cost increase resulted from higher ocean freight rates and cost approximately $1.2 million in the quarter, but was partially offset by recent price increases. Recent contractual agreements have helped to stabilize barite costs, and increases in pricing are anticipated to recapture these costs in the second half of 2005. The quarter was also adversely impacted by a $1.8 million earnings decline in Canada related to the early break-up and the cost of introducing a new drilling fluid system in that market.

"Projected EBIT margins for the year are expected to be impacted by about 1% as a result of these factors, but we expect to increase revenue sufficiently to achieve our profit objectives," Cole said. "Four factors point to improved results in the Drilling Fluids segment during the remainder of the year: first, we anticipate that deepwater work will pick up by mid-year. Second, we have been offered contract opportunities to provide our high-performance water based fluid systems in a number of foreign countries, which should build revenue and margins. Third, the costs associated with introducing the New-100 fluid systems in Canada should be past us in the second quarter, as eight systems were built in the quarter. This fluid has demonstrated up to 30% increased penetration rates on deep wells, and is rapidly gaining market

acceptance. Subsequent reuse of the same base systems will provide higher margins on incremental projects. Finally, we believe that the seasonal factors in the Mid-Continent market will improve revenue and income during the remainder of 2005."

E&P Waste Disposal

Waste processing revenue of $15.4 million declined $1.8 million from the year ago quarter due to the early seasonal break-up in the Canadian market. Operating earnings were $1.3 million or 9% compared to $2.8 million and 16% in the 2004 period. The earnings decline resulted from the combined effect of the revenue decline in Canada and the start-up costs associated with the new water treatment operations in Wyoming. In the Gulf Coast market, changes in recycling processes impacted capacity through part of the quarter. Total volume received in Gulf Coast operations was 771,000 barrels at an average of $12.88 of revenue per barrel.

"Because our capacity was restricted due to process changes for part of the quarter," Cole indicated, "we had to defer certain work during the period, which impacted revenue and operating income. The market is stronger than our recent results indicate, and the second quarter is off to a better start consistent with an improved outlook."

Water Treatment Solutions

During the first quarter, Newpark Water Treatment Solutions took delivery of the first water treatment plant employing new proprietary Armel Activator technology. The unit is being installed at Newpark's Boulder, Wyoming, plant and will facilitate beneficial reuse of water produced with natural gas from the Jonah-Pinedale field. The unit was also awarded its first contract for processing produced water from coal bed methane production near Gillette, Wyoming, and expects the plant to be on line in June. Field tests in the Canadian oil sands market are also scheduled to begin in June.

Balance Sheet and Liquidity

Newpark ended the quarter with long-term debt of $191 million, including $44.1 million borrowed under its $85 million bank credit facility. Long-term debt made up 36.8% of the Company's capital structure at quarter-end. Capital spending within established segments during the quarter totaled $6.5 million, compared to $6.2 million in depreciation. The Company also invested $3.9 million in the first quarter for acquisition of the first two water treatment systems.

* * *

22.    On May 3, 2005, Newpark filed its quarterly report with the SEC on Form 10-Q for first quarter 2005, the quarterly period ended March 31, 2005, which reaffirmed the Company's previously announced financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q included certifications signed by the Individual Defendants stating that the Form 10-Q did not include any material misrepresentations.

23.    On July 25, 2005, Newpark issued a press release titled "Newpark Resources Reports Increased Second Quarter Earnings on 35% Revenue Growth." Therein the Company, in relevant part, stated:

> METAIRIE, La., July 25 /PRNewswire-FirstCall/ -- Newpark Resources, Inc. (NYSE: NR) today announced that it earned $4.8 million, or $0.06 per share, during the quarter ended June 30, 2005, compared to net income of $1.3 million, or $0.02 per share, for the same quarter of 2004. Revenue increased 35% to $141.5 million in the 2005 quarter from $104.6 million in last year's quarter.
>
> For the six months ended June 30, 2005, the Company reported net income of $9.7 million, equal to $0.12 per share, which compares to earnings of $2.8 million, or $0.03 per share, in the first six months of 2004. Revenue totaled $270.5 million in the first six months of the current year, an increase of 29% from $208.9 million reported in the same period of 2004.
>
> Drilling Fluids
>
> Jim Cole, Newpark's CEO commented, "Newpark Drilling Fluids is continuing to gain momentum in the marketplace as it penetrates the market, and this is translating into improved earnings and margins for the unit."
>
> The number of rigs serviced by Newpark in the U.S. market during the second quarter of 2005 rose 32% to 198 compared to 150 in the same quarter of 2004. Year-to-date, the average number of rigs serviced by the unit increased 36% to 192, compared to 141 in the first six months of 2004. Comparable market activity for both the quarter and year-to-date, as measured by the rig count in the markets served by the company, has increased 13%. Newpark's share of that market rose from 16% at mid-year 2004 to 20% at the recent quarter end.
>
> Drilling Fluids' contribution to second quarter 2005 operating income rose by $7.2 million to $9.7 million, compared to $2.5 million in the same quarter of 2004.

Operating margin for the segment improved to 10% in the 2005 quarter from 4% a year ago.

"Operating margins were negatively impacted by over 200 basis points by an increase in barite cost in the current period," Cole stated. "But we believe that price increases and reductions in barite cost will improve margins in the second half of the year."

Revenue for the quarter increased to $96.6 million, up 65% from $58.4 million in the year-ago quarter.

For the six-months-to-date, the contribution of the Drilling Fluids segment to operating income amounted to $16.4 million, compared to $8.8 million in the same period of 2004. Current period operating margins increased to 9% compared to 7% in the 2004 period. Revenue for the period totaled $178.3 million, up 43% from $124.6 million in 2004.

Mat Sales, Rentals and Integrated Services

The matting segment's contribution to operating income for the first half of 2005 totaled $8.8 million, compared to $3.1 million in the same period of 2004, reflecting improvements affecting key product lines within the segment. First-half revenue increased to $61.0 million from $52.1 million a year ago.

The segment's contribution to operating income in the second quarter totaled $3.0 million, compared to $3.5 million at the peak of 2004's operations. Revenue in the 2005 second quarter, at $29.0 million, was $2.2 million below the $31.2 million reported in the same period of 2004.

Gulf coast oilfield mat rental volume in the second quarter declined on slower than usual turnover of rig sites installed in the first quarter. Non-oilfield rentals declined due to seasonal factors in the electric power industry and delays in a major project.

Cole commented: "We believe that the third quarter volume will benefit from the next wave of rig moves as current projects are completed, and we expect to see increased non-oilfield rentals in the fourth quarter from the resumption of electric utility projects. In addition, during the remainder of the year we expect to realize the final $2 million benefit from the company's cost reduction program."

E&P Waste Disposal

U.S. Gulf Coast market revenue from waste disposal increased 9% in the first six months of 2005 to $24.8 million on increased revenue per barrel. Contribution to profit increased 25% to $3.5 million from $2.8 million in 2004. During the second quarter, Gulf Coast revenues increased 15% to $12.8 million, driven by 15% higher

average pricing. Operating contribution improved to $2.2 million, or a 17% margin, compared to 9% a year ago. Revenue and operating contribution from non-Gulf Coast markets declined in both the year-to-date and second quarter comparisons.

Commenting on E&P Waste Disposal, Cole said: "We expect that the improving trend in the U.S. Gulf Coast market will continue in the second half of the year, driven by recent activity increases in the inland waters market, which, due to tight environmental regulation, generates the largest volume of waste per rig of all the markets serviced by the company. Meanwhile, we have begun to reallocate resources and management focus, principally away from our non-Gulf Coast operations, to support development of the new water treatment business. Most of the decline in operating contribution outside the Gulf Coast reflects the start-up costs of over $500,000 to date in 2005 borne by those operations."

Water Processing Technology

Over the past year, Newpark reallocated resources to the development of new market opportunities employing a unique new process technology.

"We are very much encouraged by the enthusiasm we have seen in the marketplace and the results achieved thus far in the field," said Cole. "In the first U.S. application of the technology, Newpark began processing water associated with natural gas production in the Jonah and Pinedale fields at its Boulder, Wyoming, facility. While still in the start-up and testing phase of our operating plan, we are producing water meeting the discharge requirements of our permit, and we expect to begin commercial operation very soon." He continued, "Construction is progressing on the second plant near Gillette, Wyoming, and that facility is expected to be complete late in the third quarter. Our final objective for the year is to have a test unit in operation in the Canadian oil sands market in the fourth quarter in order to begin a demonstration of the capabilities of the Armel Activator technology in that important and growing market."

Balance Sheet Data

"In a period of substantial revenue growth and establishment of the new water technology, we've funded working capital and capital additions principally from cash flow. Longer-term we are still committed to work toward a 30% debt to total capital target," Cole indicated. "But we don't believe that will be the priority for the remainder of 2005, given the market opportunity that we see ahead of us."

Newpark ended the quarter with debt representing 37% of long term capital, substantially unchanged from year-end. At June 30th, borrowings under the Company's revolving bank credit facility totaled $31.0 million, with $8.1 million in letters of credit issued and $22.7 million of the facility unused.

Capital expenditures in the second quarter of $9.6 million included $5.4 million in the drilling fluids unit which were accelerated to meet the sharply increased level of awarded work and $2.9 million in the matting segment, principally to maintain current capacity. As a result of the April acquisition of the DuraBase(TM) composite mat manufacturing facility, property, plant and equipment increased by $15.6 million, principally a non-cash addition. Depreciation and amortization in the quarter increased to $6.5 million.

* * *

24.      On August 4, 2005, Newpark filed its quarterly report with the SEC on Form

10-Q for second quarter 2005, the period ended June 30, 2005, which reaffirmed the Company's

previously announced financial results. Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-Q

included certifications signed by the Individual Defendants stating that the Form 10-Q did not

include any material misrepresentations.

25.      On November 7, 2005, Newpark issued a press release titled "Newpark Resources

Reports Third Quarter and Nine Months Earnings." Therein the Company, in relevant part, stated:

METAIRIE, La., Nov. 7 /PRNewswire-FirstCall/ – Newpark Resources, Inc. (NYSE: NR) today announced that, in the third quarter of 2005, it earned net income of $5.0 million equal to $.06 per share, on revenue of $139.1 million. This compares to 2004 third quarter net income of $735,000, equal to $0.01 per diluted share, on revenue of $110.8 million.

For the nine months ended September 30, 2005, Newpark earned net income of $14.7 million, equal to $0.17 per share, on revenue of $409.7 million. This compares to 2004 net income of $3.5 million or $.04 per share, on revenue of $319.7 million.

James D. Cole, Newpark's CEO, stated: "Over the past several years, we have worked to diversify Newpark's revenue base to new markets beyond our historic Gulf Coast base. More than half of our revenue now comes from new markets entered as we diversified the company. The profit reported in the recent quarter was earned from these new markets and points out the progress that we have made implementing that strategy."

"Newpark would have earned approximately $0.10 per share in the third quarter, excluding $0.01 of tax benefits, but for the tropical storms in the period which cost us

–15–

$.05 per share. Approximately half of that amount should be recovered from business interruption and other insurance in future periods," he continued. "We expect to demonstrate continuing improvement in earnings in the fourth quarter in spite of the lingering effects of Hurricanes Katrina and Rita. The Company's Venice, La., facilities have been out of service since the passage of Hurricane Katrina and are expected to remain idled until early next year. We have been able to service our customers operations from other Newpark sites pending the restoration of service. All other Newpark facilities are operating, although the Cameron sites damaged by Hurricane Rita are providing only limited services to drilling fluids and E&P waste customers until repairs currently underway are completed in December. We anticipate that we will see more activity in that key offshore support market in the first quarter of 2006, as customers return to more normal operating patterns."

Drilling Fluids Sales and Engineering

The Drilling Fluids unit continued its strong growth pattern in the third quarter. For the nine months ended September 30, 2005, drilling fluids revenue totaled $282.6 million, an increase of 44% from $196.0 million reported in the 2004 period. Third quarter segment revenue increased 46% to $104.3 million compared to $71.4 million in the year-ago quarter, and increased sequentially by 8.0% or $7.7 million from the second quarter of 2005 despite the impact of the storms in the recent quarter. Operating income for the nine months improved to $29.1 million, or 10.3% of revenue, versus $13.8 million or 7.0% in the prior year period. For the third quarter, operating contribution rose to $12.7 million, or 12.2% of revenues, compared to a contribution in the 2004 quarter of $5.0 million, or 7.0% of revenue. Margins improved sequentially by 220 basis points compared to 10.0% in the second quarter of 2005.

"We believe that Hurricane Katrina reduced drilling fluids revenue by at least $9.0 million in the third quarter, with a corresponding operating income effect of over $3.5 million. While the after-effects of Katrina and Rita will be felt in the fourth quarter and early in 2006, we believe that the recent pattern of revenue and margin improvement should continue through 2006," Cole continued. "Next year we should also begin to realize the benefits of the recently-announced formation of Newpark Drilling Fluids of Brazil, a joint venture with Brasil Supply, and we anticipate that first revenue from the Brazilian market should be recorded in the first quarter of 2006."

Mat and Integrated Services

For the nine-months ended September 30, 2005, mat operations generated operating income of $9.0 million on revenues of $82.3 million compared to $4.2 million from 2004 operations on revenue of $76.1 million. Third quarter segment revenue totaled $21.3 million, down 11% from the corresponding quarter of 2004, and off 26%

sequentially as a result of storm-related interruptions in operations. Third quarter operating profit of $165,000 compares to an operating profit of $1.2 million in the year-ago period and $3.0 million in the second quarter of 2005. The earnings decline in both comparisons is attributable to the decline in revenue.

"The key factor affecting the quarter was the revenue decline in the most profitable parts of the mat rental business. We already have indications that the oilfield segment of the market is beginning to rebound, with work scheduled for completion in the fourth quarter already above the third quarter total. We believe that this pattern should continue into 2006 as funds are allocated to new drilling projects," Cole said.

Rental volume installed in the oilfield market declined by 1.1 million square feet year-over-year, and 1.0 million sequentially to 2.3 million square feet, while pricing improved fractionally to $1.09 per square foot from $1.03 a year ago. Non-oilfield rentals, a market focused on electric utility expansion, declined by $1.7 million as customers shifted their focus to service restorations following four tropical storms in the quarter.

Sales of DuraBase(TM) and Bravo(TM) composite mats generated revenue of $4.9 million in the recent quarter, compared to $5.6 million a year ago. Bravo(TM) mat units sold doubled to over 7,500 units in the September quarter compared to the same quarter of 2004 on improved market acceptance of the product. Sales of the stronger and more expensive DuraBase(TM) units declined from 3,300 units a year-ago to 1,200 in the third quarter.

E&P Waste Disposal

E&P revenues for the three quarters ended September 30, 2005 totaled $44.8 million, a decline of $2.8 million or 5.8% from the same period of 2004. Third quarter revenue was $13.5 million, 12% below the $15.4 million reported in the third quarter of 2004. Operating income for the nine month period declined by $2.2 million or 39% to $3.4 million from $5.6 million in 2004. For the quarter, operations resulted in a loss of $150,000 compared to a $1.2 million profit in the year-ago quarter as a result of the lower revenue.

"We believe that the weather's impact on Gulf Coast operations in the quarter amounted to $3.2 million in revenue and $2.5 million in operating income," said Cole. "Longer term, the damage to the service infrastructure, docks and drilling rig fleet resulting in lower current drilling activity, will impact the E&P waste unit during the fourth quarter and until all rigs are back in service in 2006. In both revenue comparisons, the decline also relates to changes in our strategy with respect to the Canadian market, which has focused on supporting the development of the new water technology operation and borne much of that start-up cost. Key Gulf Coast

market revenues have improved over the same period on higher rig activity and improving pricing."

E&P volume in the third quarter increased 7% to 683,000 barrels compared to 640,000 in the year-ago quarter. Pricing averaged $12.59 per barrel in the third quarter of 2005, an increase of 5.1% from $11.97 a year ago. Operations in the 2004 quarter were slowed by a processing change that limited capacity in the period.

Water Processing Technology

During the quarter, commercial operation of the Boulder, Wyo., facility began, though at limited volumes during a period of training and testing the capabilities of the facility. "As a result of favorable test results in the water produced at the plant, we have accelerated plans to increase the plant's throughput capacity, and have initiated several additions to the original plant design aimed at raising output to as much as 8,000 barrels per day. These developments should be fully in place by mid-December," Cole indicated.

Two testing and demonstration plants have been transported to the Canadian market, and are expected to begin testing in late November in the Fort McMurray Oil Sands market. Construction of the new 20,000 barrel per day Gillette, Wyo., plant is nearing completion and the first water is expected to be tested in the facility in November, with operations beginning in December.

Liquidity and Balance Sheet

During the quarter, Newpark invested $5.4 million in capital assets, with $2.0 million concentrated in acquisition of equipment and facilities for the new water treatment business and a like amount used to expand the Gulf Coast infrastructure supporting the drilling fluids operation. Long-term debt at the end of the period totaled $193.2 million or 36% of long term capital. Borrowings under the Company's bank credit facility included $13.9 million of letters of credit and cash advances of $33.1 million, with $23 million available for cash advances.

* * *

26.     On November 9, 2005, Newpark filed its quarterly report with the SEC on Form 10-Q for third quarter 2005, the quarterly period ended September 30, 2005. The Company's Form 10-Q reaffirmed the Company's previously announced financial results.  Pursuant to Section 302 of

Sarbanes-Oxley, the Form 10-Q included certifications signed by the Individual Defendants stating

that the Form 10-Q did not include any material misrepresentations.

27.    March 6, 2006, Newpark issued a press release titled "Newpark Resources Reports

Full Year and Fourth Quarter 2005 Results; Total Revenues Increase 28.5% * Net Income Grows

440% Year Over Year * Hurricanes Impact Earnings By $0.08 Per Share." Therein the Company, in

relevant part, stated:

> METAIRIE, La., March 6, 2006 /PRNewswire-FirstCall via COMTEX News
> Network/ -- Newpark Resources, Inc. (NYSE: NR) today reported net income for the
> year ended December 31, 2005 of $21.6 million, or $0.25 per common share, on
> revenue of $557.0 million. This compares to 2004 net income of $4.0 million, or
> $0.05 per common share, on revenue of $433.4 million.
>
> For the fourth quarter of 2005, Newpark reported net income of $6.9 million or $0.08
> per share, on revenue of $147.3 million. This compares to net income of $526,000 or
> $0.01 per share, on revenue of $113.7 million in the 2004 quarter. Amounts for 2004
> include $4.2 million of non-cash charges, equal to $0.03 per share, affecting both the
> year and the fourth quarter results.
>
> The quarterly and annual net income reported are in line with analyst estimates and
> our 2005 guidance.
>
> Consolidated revenue and segment operating income gains in both the year and
> fourth quarter were driven by continued growth in the company's drilling fluids
> segment, which increased revenue by 42% during 2005 notwithstanding the impact in
> the third and fourth quarters of hurricanes in the Gulf of Mexico.
>
> James D. Cole, Newpark's Chief Executive Officer commented: "We believe that
> Hurricanes Katrina and Rita, which directly affected both the drilling fluids and E&P
> waste business, reduced reported revenue by more than $21.0 million, impacting
> reported earnings by approximately $0.08 per share. To date, Newpark has recovered
> approximately $8.3 million of its insured losses, including principally property
> damage and a portion of its business interruption claims related to Hurricanes Katrina
> and Rita. Determination of the additional amount of the business interruption claims
> has not yet been completed."
> Drilling Fluids Segment
>
> Drilling fluids revenue for 2005 totaled $386.2 million, an increase of 42% from
> $272.9 million the prior year. Segment operating margin increased 90% to $41.4

million in 2005 compared to $21.8 million the prior year. This equates to a 10.7% operating margin in 2005, up from 8.0% in the year-ago period.

Fourth quarter 2005 revenue of $103.7 million increased 34.9% from $76.9 million in the year-ago period, the result of continued strong growth in markets outside of the storm-impacted Gulf Coast, as the number of rigs serviced by Newpark in the fourth quarter increased 25% compared to a year ago. Segment operating income rose by over 44% to $11.6 million, or 11.2% of revenue, compared to $8.1 million, equal to 10.5% of revenue, in the 2004 quarter.

Cole commented, "Much of the fourth quarter revenue growth came from the unconventional gas markets in the Mid-Continent region made possible by advances in drilling and fracture stimulation technology. Newpark began to develop a position in these markets several years ago and has made considerable progress deploying the NewPhase(TM) product, a component of the company's high performance water-based product line, to create high performance fluid systems tailored to the drilling problems created by the reactive shale strata encountered in that market. With the continued development of shale plays in various U.S. basins, such as in the Mid Continent and the Rockies, we are optimistic about further market penetration for NewPhase(TM)."

E&P Waste Services

E&P waste segment revenue declined 5% to $61.3 million in 2005 compared to $64.5 million in 2004, the combined effect of adverse tropical weather and the focus of key personnel on the start-up of the new water treatment technology project. The Gulf Coast component of revenue suffered a volume decline from 3.2 million barrels in 2004 to 3.1 million in 2005 due to the late season storms. This was offset by a 10% increase in average revenue per barrel to $12.96 arising from favorable changes in mix. The segment operating contribution for 2005 was $6.4 million, equal to 10.4% of revenue, compared to $8.2 million, or 12.6% of revenue in 2004.

Fourth quarter 2005 revenue totaled $16.4 million, substantially unchanged from $16.9 million in the final quarter of 2004. Segment operating profit of $2.8 million equaled 16.9% of revenue as compared to 14.8%, or $2.5 million, a year ago. Gulf Coast market waste volume in the fourth quarter rebounded sequentially to 803,000 from 683,000 barrels in the third quarter of 2005 as the company moved rapidly to reopen storm-damaged facilities and captured increased market share in the process.

Water Treatment Technology

Newpark is continuing work to commercialize a new proprietary water treatment technology, with current engineering efforts directed to improve the throughput capacity of the company's Boulder, Wyo. waste disposal site serving the Jonah and

Pinedale fields in southwestern Wyoming, a very active North American natural gas market. In addition, Newpark has completed construction and is currently starting operation of its Gillette, Wyo. treatment facility which it will operate for a major independent gas producer in the coal seam methane market.

"Testing is slated to begin this month near Fort McMurray, Alberta, applying our water treatment technology to recycle contaminated water generated with production from oil sands in that area," said Cole. "We believe that there is additional value to be created by capturing the heat energy contained in the water and returning it to the operator, potentially reducing their energy consumption in the production process. Application of this proprietary technology to the waste water problems within the oil and gas industry could create a major new business opportunity for Newpark."

Mat Sales and Mat Rentals

Mat segment revenue totaled $109.5 million for fiscal 2005, generating $11.1 million in operating contribution. This compares to $96.0 million in 2004 revenue, and $4.4 million in segment operating profit. The earnings improvement reflects, in part, operating cost reductions implemented during the year.

"The mat segment was less directly impacted by the storms than drilling fluids and E&P waste, and suffered much less physical damage to facilities and equipment," Cole explained. "However, we encountered numerous delays in the start-up of new projects as customers revised their priorities following the storms, and this held revenue below our expectations in the fourth quarter."

Increased sales of wooden and composite mats accounted for $10.3 million of the revenue increase. Total site volume for 2005 was 13.5 million square feet at an average price of $1.08 per square foot, and compares to 15.9 million square feet in 2004 averaging $1.00 per square foot.

Fourth quarter mat segment revenues totaled $27.2 million, compared to $19.9 million in the 2004 quarter. Mat sales contributed $8.8 million of the total segment revenue, and $6.2 million of the year-over-year revenue change, on the strength of increased units sold in both the DuraBase(TM) and Bravo(TM) product lines. Segment operating contribution improved from $182,000 in the 2004 quarter to $2.0 million in the recent period, principally from mat sales operations. Total mat rental installations in the quarter amounted to 3.6 million square feet, with average pricing at $0.98 per square foot.

Cole commented: "As in the third quarter, fourth quarter operating results were impaired by the effects of severe tropical weather affecting our Gulf Coast rental market. We expect earnings from the segment to improve in 2006, led by an expected 25% increase in mat rental pricing and improved volume as market conditions return

to normal, coupled with completion of our cost reduction program now fully in place. Finally, we anticipate that 2006 will demonstrate growth of non-oilfield rentals, principally to the utility industry, which declined in the second half of last year in the wake of tropical weather in the Gulf."

Balance Sheet Data

Newpark ended the year with $8.0 million in cash and borrowings of $32.7 million outstanding under its bank credit facility. Working capital increased by $19.0 million during the year, principally due to the need to carry increased levels of accounts receivable due to the increase in revenue during the period. Cash used for capital expenditures within the existing operating units totaled $18.3 million for the year, net of $4.7 million of financed additions and $1.5 million of asset sales. In addition, the Company invested $11.2 million implementing the new water treatment technology during the period.

\* \* \*

28.    On March 14, 2006, Newpark filed its annual report with the SEC on Form 10-K for the fiscal year ended December 31, 2005. The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results.  Pursuant to Section 302 of Sarbanes-Oxley, the Form 10-K included  certifications signed by the Individual Defendants stating that the Form 10-K did not include any material misrepresentations.

29.    Defendants' statements described above in ¶¶ 20-29, above, were materially false and misleading when made because defendants knew or recklessly disregarded but failed to disclose irregularities with the processing and payment of invoices by the Company's subsidiary, Soloco Texas, LP.  As a result, defendants' Class Period statements concerning Newpark's operations, financial performance, and internal controls were materially false and misleading.

**Disclosures at the End of the Class Period**

30.    On April 17, 2006, before the markets opened, the Company issued a press release titled "Newpark Commissions Internal Investigation." Therein the Company, in relevant part, stated:

METAIRIE, La., April 17, 2006 /PRNewswire-FirstCall via COMTEX News Network/ -- Newpark Resources, Inc. (NYSE: NR) today announced that, based on information that has come to its attention, the Audit Committee has commissioned an internal investigation regarding potential irregularities involving the processing and payment of invoices by Soloco Texas, LP, one of the Company's smaller subsidiaries, and other possible violations. It has not yet been determined whether all or any portion of these payments is recoverable.

31.    The April 17, 2006 press release further stated that the Company's former CEO and CFO – the Individual Defendants herein – has been placed on administrative leave pending the completion of the Company's internal investigation, as follows:

> Effective immediately, and pending completion of the investigation, the CEO of the Company has placed on administrative leave the chairman and CEO of Newpark Environmental Water Services, LLC, one of the Company's operating divisions, as well as the Company's chief financial officer, and an officer of Soloco Texas, LP. No determination of the culpability, if any, of these individuals or any other employees of the Company has or will be made until the internal investigation is complete. Mr. Paul Howes, who was elected as the Company's chief executive officer on March 22, 2006, is managing the Company and overseeing its day-to-day operations.

> The Company's Audit Committee has engaged the Jones Walker law firm of New Orleans as special investigation counsel.

32.    The news shocked the market. As a result, shares of Newpark fell $1.28 per share, or 17.25%, to close on April 17, 2006, at $6.14 per share following the disclosure of the Company's internal investigation into the irregularities involving invoice processing and payment by the Company's subsidiary, Soloco Texas, LP.

## CLASS ACTION ALLEGATIONS

33.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Newpark securities between February 28, 2005 and April 16, 2006, and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all

relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

34.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Newpark securities were actively traded on the New York Stock Exchange ("NYSE"). As of March 6, 2005, there were 89.3 million Newpark shares outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Newpark or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

35.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the Exchange Act as complained of herein.

36.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        i.      whether the federal securities laws were violated by defendants' acts as alleged herein;

        ii.     whether statements made by defendants to the investing public during the

Class Period misrepresented material facts about the business, operations, management and financial performance of Newpark; and

        iii.    to what extent the members of the Class have sustained damages and the proper measure of damages.

    38.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SCIENTER ALLEGATIONS

    39.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Newpark, their control over, and/or receipt and/or modification of Newpark's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Newpark, participated in the fraudulent scheme alleged herein.

    40.    Further proof of Defendant Hardey's scienter is demonstrated by him selling 50,000 of his Newpark shares on December 9, 2005, for profits totaling approximately $400,000.

## UNDISCLOSED ADVERSE FACTS

41.    The market for Newpark securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Newpark securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Newpark securities relying upon the integrity of the market price of Newpark securities and market information relating to Newpark, and have been damaged thereby.

42.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Newpark securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

43.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Newpark's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Newpark and its business, operations, financial performance, and internal controls, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other

members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

44.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

45.     During the Class Period, Plaintiff and the Class purchased or otherwise acquired Newpark securities at artificially inflated prices and were damaged thereby.  The price of Newpark common stock declined when the truth about the defendants' activities were made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Newpark securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

48.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Newpark securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

49.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, financial performance, and internal controls of Newpark as specified herein.

50.    These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Newpark's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Newpark and its business operations and performance in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Newpark securities during the Class Period.

51.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or

directors at the Company during the Class Period and member of the Company's management team or had control thereof; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior officers and/or directors of the Company were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

52.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Newpark's operating condition and performance from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

53.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Newpark securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Newpark's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Newpark securities during the Class Period at artificially high prices and were damaged thereby.

54.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Newpark was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Newpark securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

56.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

–30–

## Violation Of Section 20(a) Of
## The Exchange Act Against the Individual Defendant

57.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.    The Individual Defendants acted as controlling persons of Newpark within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

60.    As set forth above, Newpark and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other

–31–

members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

1.  Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

2.  Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 21, 2006                    Respectfully submitted,


**KAHN GAUTHIER SWICK, LLC**


By_____
Lewis S. Kahn, Esq. (23805)
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone:    (504) 455-1400

**MURRAY, FRANK & SAILER LLP**
Eric J. Belfi
Bradley P. Dyer
275 Madison Avenue, 8th Floor
New York, NY 10016
Telephone:    (212) 682-1818
Facsimile:    (212) 682-1892

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:    (310) 201-9150
Facsimile:    (310) 201-9160

*Attorneys for Plaintiff*

### GLANCY BINKOW & GOLDBERG LLP
### SWORN CERTIFICATION OF PLAINTIFF SANDRA M. KIM
### NEWPARK RESOURCES SECURITIES LITIGATION

I, SANDRA M. KIM, certify that:

1.      I have reviewed the Complaint and authorized its filing.

2.      I did not purchase NEWPARK RESOURCES, the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in NEWPARK RESOURCES, during the Class Period set forth in the Complaint are as follows:

I bought 400 shares on 09/09/2005 at $ 8.71 per share
I sold _____ shares on ___/___/___ at $ ____ per share
I sold _____ shares on ___/___/___ at $ ____ per share

(List Additional Transactions On Separate Page If Necessary)

5.      I have not served as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

☐      Check here if you are a current employee or former employee of the defendant Company.

I declare under penalty of perjury that the foregoing are true and correct statements.

_____
(Please Sign Your Name Above)
SANDRA M. KIM

Dated: April 19, 2005